**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

ARCHER WESTERN – DE MOYA JOINT VENTURE

Plaintiff,

vs.

BERKLEY ASSURANCE COMPANY,

Defendant.

CASE NO. :

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff ARCHER WESTERN – DE MOYA JOINT VENTURE (the "JV" or "Plaintiff"), by and through its attorneys, Saxe Doernberger & Vita, P.C., hereby complains and alleges as follows against Defendant BERKLEY ASSURANCE COMPANY ("Berkley" or "Defendant"):

## PARTIES, JURISDICTION, AND VENUE

1. The JV is a joint venture comprised of Archer Western Contractors, LLC and The de Moya Group, Inc., organized and existing under the laws of the State of Florida, with its principal place of business located at 4343 Anchor Plaza Parkway, Suite 155, Tampa, FL 33634; the JV, by and through its members, Archer Western Contractors, LLC and The de Moya Group, Inc., is engaged in the business of design-build construction work in Dade County, Florida.

2. Defendant Berkley is a for-profit corporation organized under the laws of the State of Iowa, with its principal place of business located at 7233 East Butherus Drive, Scottsdale, AZ 85260-2410, and is authorized to engage in the business of insurance in Florida, including issuing policies of insurance and/or insuring risk that is the subject matter of this litigation within the State of Florida.

3. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the jurisdiction of this Court and a substantial part of the property that is the subject of this action is situated within the jurisdiction of this Court.

5. All conditions precedent to the filing of this lawsuit have occurred, have been waived, or have been performed.

**GENERAL ALLEGATIONS AS TO ALL COUNTS**

**The Project and Covered Losses**

6. On or about February 6, 2017, the Florida Department of Transportation ("FDOT"), in conjunction with the Miami-Dade Expressway Authority ("MDX"), issued a Request for Proposals (the "RFP") soliciting competitive proposals for design-build services on a project to enhance three major transportation corridors in Miami, including State Road 836 (SR836), Interstate 95 (I-95), and Interstate 395 (I-395) (the "Project").

7. In general terms, the "design-build" method of project delivery involves the project owner contracting with a design-builder to deliver both the design and construction of a project. In such a model, the design-builder typically subcontracts to others for various project components, including the design and engineering.

8. The RFP for the Project sought design-build services to be performed for a guaranteed maximum price.

9. Among other things, the RFP included a unique precast segmental arch bridge on Interstate 395, spanning over 1,000 feet over the portion of Biscayne Boulevard known as the Heritage Trail (the "Signature Bridge").

10. The RFP included a set of concept plans and reference documents intended to convey FDOT's design objectives for the Project, including proposed

dimensions and aesthetics for the Signature Bridge.

11. The RFP required offerors to submit aesthetic design proposals for the Signature Bridge, for review and approval by FDOT's Aesthetic Review Committee.

12. The RFP also required offerors to provide various documents depicting proposed elevations, dimensions, and other details demonstrating that the proposed Signature Bridge conformed to FDOT's Structural Detailing Manual.

13. The RFP stated that the Signature Bridge "shall meet the criteria set forth in this document." To ensure that offerors complied with the RFP, FDOT required a licensed structural engineer to certify that renderings included with the offer were dimensionally accurate and met certain requirements for length, height, layout, and other dimensions.

14. The RFP stated FDOT would not permit the winning offeror to make dimensional changes to the Signature Bridge design intent, except minor deviations within well-defined tolerances.

15. On February 26, 2016, Archer Western and de Moya entered into a Joint Venture Agreement to bid on the Project, forming the JV.

**The JV and HDR**

16. The JV contracted with HDR Engineering, Inc. ("HDR") to perform design services for the Project, including the Signature Bridge, to support its bid for the Project.

17. The JV's contract with HDR included two phases (collectively, the "HDR Agreement").

18. In basic terms, HDR was obligated under the HDR Agreement to prepare a Signature Bridge design, including design, materials, cost, and construction schedule, which the JV would then rely on to prepare its bid, accounting for the RFP's guaranteed maximum price term.

19. The HDR Agreement described HDR's scope of services as "preparing and providing the complete design, and the plans and specifications specified in, or required

by, the RFP" (the "Preliminary Design Documents").

20. The HDR Agreement stated: "The standard of care for all professional services provided by [HDR] pursuant to this [HDR Agreement] shall be the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services are performed."

21. The HDR Agreement required HDR, through licensed and qualified design professionals, to prepare preliminary design documents, including "all work product necessary to comply with the design requirements of the RFP."

22. The HDR Agreement required HDR to, among other things "advise [the JV] of additional studies and testing required for Project design and the impact results of such studies and testing may have on [the JV]'s price and schedule."

23. In order to meet the standard of care outlined in the HDR Agreement, HDR was obligated to, amongst other things, research, calculate, and properly account for anticipated wind loads that would be encountered by the Signature Bridge and factor those wind loads into Preliminary Design Documents.

24. The HDR Agreement obligated HDR to prepare and provide the complete design and accompanying plans and specifications specified in or required by the RFP, including those for the Signature Bridge. The HDR Agreement obligated HDR to provide $10,000,000 of project-specific professional liability insurance and limited HDR's liability under the contract to the $10,000,000 insurance policy, except in circumstances where loss or damage arises from HDR's gross negligence, willful misconduct, criminal acts, fraud, intentional acts, or third-party actions.

**The Design-Build Contract**

25. The JV submitted a written proposal to FDOT in response to the RFP – which included the Preliminary Design Documents prepared by HDR.

26. Included in the JV's proposal were two certifications, executed by an authorized representative of HDR, attesting that the Preliminary Design Documents for

the Signature Bridge complied with FDOT's technical requirements for road and bridge construction.

27. HDR specifically certified in the Preliminary Design Documents the dimensional accuracy of the cable layout, apex height, height of cable attachments, suspension span length, pier/arch/pylon locations, and other dimensions of the Signature Bridge.

28. HDR further certified "that sufficient preliminary engineering has been performed to ensure the viability of the Signature Bridge being proposed."

29. Based on the proposal and the Preliminary Design Documents, as well as HDR's certifications therein, FDOT awarded a contract to the JV for all engineering, design, procurement, and construction necessary to complete the Project.

30. The JV entered into a design-build contract with FDOT for the Project on July 12, 2018, with a contract start date of October 29, 2018 (the "Design-Build Contract").

31. The Design-Build Contract provided a 1,460 calendar day window for the JV to complete the entire Project, with a completion date of October 28, 2022.

32. The Design-Build Contract further required the JV to submit a construction schedule, which, once accepted by FDOT, was binding on the JV and was only subject to an extension of time for delays that were outside the fault or negligence of the JV and its subcontractors, including HDR.

**HDR's Failure to Calculate Wind Loads**

33. Calculation of dynamic wind loads, drag factors, drag coefficient, and other factors that affect structural performance are particularly important when designing a long span, single rib arch bridge in an area prone to high winds, hurricanes, and severe weather.

34. Unbeknownst to the JV at the time, and approximately four months after HDR had already certified the accuracy of the Signature Bridge Design, which was relied upon in formulating the binding requirements of the Design-Build Contract, HDR first

engaged a wind consultant, RWDI, to review, analyze, and test whether HDR's design could withstand the applicable wind loads.

35. RWDI performed wind tunnel tests and a buffeting analysis and confirmed that HDR had utilized the wrong drag coefficient and failed to properly account for dynamic wind loads in the Preliminary Design Documents.

36. On or about December 5, 2018, after RWDI performed its wind tunnel test and buffeting analysis, HDR first notified the JV that HDR was exploring options to reduce wind loading on the rib arches.

37. On or about December 6, 2018, HDR notified the JV that calculations used for the Preliminary Design Documents failed to account for dynamic effects of wind on the Signature Bridge.

38. On or about December 17, 2018, HDR admitted that its calculation of wind loads for the Preliminary Design Documents was lower than actual wind loads for the Signature Bridge.

39. In retrospect, when preparing the Preliminary Design Documents, which included responsibility for making these calculations, HDR (1) failed to research expected wind loads in the area of the Signature Bridge; (2) failed to perform a proper dynamic wind analysis; and (3) failed to use correct drag coefficients for rib arches—the concrete arches that meet in the center of the bridge and support the concrete superstructure using inclined hangers.

40. Analysis and testing performed by an independent wind consultant separately retained by the JV subsequent to HDR's notifications confirmed that the Preliminary Design Documents did not properly anticipate wind loads in the design and, therefore, that the Signature Bridge design did not meet the applicable wind tolerance requirements in the Design-Build Contract.

41. HDR breached the standard of care by failing to properly assess the wind load during pre-bid design.

42. HDR has acknowledged – in writing – that it underestimated both the

dynamic wind loads to which the Signature Bridge would be subjected and the drag coefficient estimated with respect to the rib arches.

**Changes to the Signature Bridge Design**

43. HDR went back to the drawing board. HDR's first redesign proposal attempted to keep the overall project cost of the new design similar, but at the expense of the aesthetic appearance and service life of the bridge. FDOT rejected this approach and HDR went back to the drawing board again.

44. The JV then spent several months negotiating a revised design with FDOT, which was not formally approved by FDOT until May 2019, at which time ten of the eighteen months of the Project schedule designated for design activities had already elapsed.

45. Because the JV, in reliance on HDR's certifications, had committed to FDOT that it could build a bridge in accordance with all of the requirements outlined in the RFP and memorialized in the Design-Build Contract for a certain price, FDOT insisted that the JV honor those requirements by whatever means necessary, obligating the JV to build the Bridge at a cost dramatically greater than originally projected, based on HDR's original certified design, without any recourse to the JV to renegotiate the Design-Build Contract price.

46. The changes to the Signature Bridge design drastically increased the complexity of construction, increasing steel and concrete quantities, requiring additional shoring, anchoring, scaffolding, and temporary support measures, complicating the installation of post-tension steel tendons, and compelling additional coordination and supervision in order to complete the Project.

47. The changes to the Signature Bridge design caused delays to the overall completion of the Project by, *inter alia*, increasing the time needed to cast and install wooden forms specified in the new design, imposing a new requirement to develop shop drawings for approval by FDOT prior to installation of discrete parts of the Signature Bridge, and forcing the JV to alter its planned sequence of operations for erecting the

bridge.

48. HDR's negligence in the design and certification of the Preliminary Design Documents will ultimately result in the Project being delayed until at least 2025.

49. HDR's negligence has caused, and will continue to cause, the JV to incur hundreds of millions of dollars in increased design costs, construction costs, supervision costs, quality control and inspection costs, expert investigation costs, and attorneys' fees.

**The JV's CPPI Policy**

50. Berkley issued a project-specific Contractor's Protective, Professional, Pollution, Cyber, Media and Mitigation Response policy to the JV, insuring multiple risks with respect to the Project, with an effective policy period of August 29, 2018 to August 29, 2023, numbered PCB-5006402-0818 (the "CPPI Policy"). A copy of the Policy is attached hereto as EXHIBIT A.

51. Under Insuring Agreement A of the CPPI Policy, entitled **Protective Indemnity,** Berkley is obligated to indemnify the JV for "**Protective Loss** on a **Protective Claim** as established by final judgment or settlement to which we agree in writing, in excess of collectible **Recoverable Insurance**, provided that 1. the **Protective Claim** arise out of a. a negligent act, error or omission in the rendering or failure to render **Professional Services** … by the **Responsible Entity** that were rendered or performed on or after the **Retroactive Date** and before the end of the **Policy Period**."

52. The **Retroactive Date** is January 1, 2016.

53. **Protective Loss** is defined as "1. any amounts [the JV is] entitled to recover; or 2. In the event the **Protective Claim** is made against a **Responsible Entity** in whose favor [the JV has] granted a Limitation of Liability permitted by this Policy, any amounts you would have been legally entitled to recover in the absence of such Limitation of Liability; from each **Responsible Entity** … due to a negligent act, error or omission in the rendering of **Professional Services**."

54. **Protective Claim** is defined as a "written demand, demand for arbitration or mediation or a suit instituted by you against the **Responsible Entity** seeking a remedy and alleging liability or responsibility on the part of such **Responsible Entity** arising from … a negligent act, error or omission in the rendering of or failure to render **Professional Services**…."

55. **Recoverable Insurance** is defined as "1. all available liability insurance providing applicable coverage to any **Responsible Entity** … or 2. In the event the **Protective Claim** is made against a **Responsible Entity** in whose favor you have granted a Limitation of Liability permitted by this Policy, such Limitation of Liability."

56. **Professional Services** is defined in the CPPI Policy to include, amongst other things, "any delegated design responsibility or design assist services," as well as "architecture" and "engineering" and "any of the foregoing Professional Services that are . . . design services by a professionally qualified architect or engineer . . . in connection with the correction of an act, error or omission in the performance of or failure to perform Professional services[.]"

57. **Responsible Entity** is defined in the CPPI Policy to include "those persons or entities, retained by you or on your behalf, rendering **Professional Services** or **Contractor Activities**."

58. HDR is an entity that was retained by the JV to render **Professional Services** and, therefore, is a **Responsible Entity**.

59. The JV's claim against HDR, as a qualifying **Responsible Entity**, is a **Protective Claim** under the Policy.

60. The JV's losses including increased Project costs and delay-related damages due to HDR's errors in the design process are **Protective Loss** arising out of HDR's negligent acts, errors, or omissions.

61. The JV's **Protective Loss** exceeds HDR's Limitation of Liability or the amount of HDR's available liability insurance.

62. Notwithstanding the requirements of the **Protective Indemnity** coverage

part, the CPPI Policy's Section III, entitled Defense, Settlement and Cooperation, includes a provision entitled Proactive Resolution of Substantiated Protective Claim (the "Proactive Resolution Provision"), by which the Policy obligates Berkley to pay the portion of Plaintiff's **Protective Loss** in excess of available **Recoverable Insurance** as Plaintiff has substantiated that HDR's liability and Plaintiff's losses are not reasonably disputable.

63. The Proactive Resolution Provision provides that, "if [the JV] provides [Berkley] substantiation that satisfies [Berkley] that the liability of the **Responsible Entities** and the value of [the JV's] **Protective Loss** are not reasonably disputable and exceed all collectible **Recoverable Insurance**, then upon [the JV's] written request, [Berkley] will provide [the JV] … proactive assistance in pursuing recovery for [the JV's] **Protective Loss**."

64. Such proactive assistance shall include the following: "1. [Berkley] will consult with [the JV] in the prosecution of [the JV's] **Protective Claim** and provide our input on strategy for the efficient resolution of the **Protective Claim**; 2. [Berkley] will attend or otherwise participate in settlement negotiations, including mediations and settlement conferences, for the resolution of the **Protective Claim**; [and] 3. [Berkley] will assist [the JV] in negotiations with representatives for any **Recoverable Insurance**."

65. The Proactive Resolution Provision further provides that "if all of [the JV's] reasonable efforts to recover [the JV's] **Protective Loss** and the foregoing fail due to the refusal of the **Responsible Entity** or the representatives for **Recoverable Insurance** to settle [the JV's] substantiated **Protective Claim**, [Berkley] will pay the portion of [the JV's] **Protective Loss** in excess of available collectible **Recoverable Insurance**."

66. All costs incurred by Berkley under the Proactive Resolution Provision's paragraphs 1 through 3 "shall be borne by [Berkley] and shall not erode the Limits of Liability … of th[e CPPI] Policy."

67. The Proactive Resolution Provision, in contrast to Insuring Agreement A, for Protective Indemnity, does not require a settlement with, or final judgment against,

HDR in order for Berkley to become obligated to pay the JV's **Protective Loss**.

68. The Proactive Resolution Provision is written in recognition of the fact that a **Responsible Entity**, such as HDR, may not concede liability even where such liability is not reasonably disputable. Where that happens, an insured such as the JV is not required to litigate its protective claim to conclusion before receiving the benefit of the Berkley Policy's insurance dollars. Instead, the Proactive Resolution Provision compels Berkley to cooperate with its insured to reach the best resolution *proactively*.

**Berkley's Breach of its Obligations**

69. The JV notified Berkley of losses arising out of HDR's design errors with respect to the Signature Bridge on February 5, 2020.

70. Since providing initial notice, the JV has hosted regular Project update calls with Berkley and the insurers providing coverage excess to the CPPI Policy. The JV has provided at least sixteen separate document transmittals consisting of thousands of pages of project documents. The calls and many of the document transmittals were done not at the insurers' requests, but rather to ensure that the insurers, and particularly Berkley, would be ready to cooperate with the JV pursuant to the terms of the Proactive Resolution Provision.

71. On September 1, 2021, the JV gave a presentation to Berkley and other insurers providing coverage excess to the CPPI Policy utilizing independent expert analysis in bridge design and project scheduling, substantiating HDR's negligence and the JV's resulting increased costs over and above HDR's recoverable insurance. The JV provided the presentation, including the expert analysis it was based on, at its own cost.

72. Specifically, the JV presented Berkley evidence that its incurred costs because of HDR's negligence as of the September presentation were $26,469,884.76 and were expected to reach $155 million over the life of the Project.

73. The JV's presentation provided overwhelming factual, technical, and expert evidence supporting each and every factual allegation contained in this complaint related to HDR.

74. The JV provided Berkley with all relevant documents from the Project, both on its own initiative and in response to specific requests for information from Defendants, including providing those relied on in the September 1, 2021 presentation well in advance of the presentation.

75. Two days after its presentation, on September 3, 2021, the JV sent a letter to Berkley requesting that Berkley provide assistance and cooperation under the Proactive Resolution Provision in addressing the JV's **Protective Claim** against HDR.

76. Despite the JV's request for Berkley's cooperation and assistance under the Proactive Resolution Provision, Berkley has not taken any action to assist or cooperate with the JV.

77. Berkley has had all information and evidence necessary to have fully investigated the JV's insurance claim and, in the face of overwhelming evidence against HDR, numerous admissions by HDR, and effectively no dispute by HDR over its liability for design errors, cannot reasonably dispute HDR's liability or the JV's covered **Protective Loss** far in excess of Berkley's policy limits.

78. Berkley has retained at least one technical expert: engineer Alfred E. Schaer. Mr. Schaer was present for most of the update calls and for the September 1, 2021 presentation. Upon information and belief, Berkley has also retained a bridge design expert to offer an opinion on whether HDR was negligent.

79. Upon information and belief, Berkley's retained technical experts agree with the JV's technical experts and are also of the opinion that HDR breached the standard of care.

80. Hearing nothing from Berkley, on January 5, 2022, the JV and HDR participated in a mediation session in which the JV delivered virtually the same presentation to HDR as it had delivered to Berkley, emphasizing HDR's negligence.

81. To date, Berkley has not inquired as to the status of the JV's **Protective Claim**.

82. Berkley has had far more than sufficient substantiation to satisfy itself that

HDR's liability and the value of the JV's **Protective Loss** are not reasonably disputable and will exceed HDR's $10,000,000 limits, which include defense costs within the limits of liability and, therefore, continue to erode with each day the JV and HDR remain in a dispute.

83. Berkley had nineteen months to investigate and evaluate the JV's claim before the September 1, 2021 presentation, and has had an additional six months since then, yet it remains silent.

84. The JV believes that, despite having evidence and expert analysis from the JV's experts and its own experts establishing that HDR was negligent and despite having no evidence to the contrary, Berkley is nevertheless pretending to be "unsatisfied" that HDR's liability is not reasonably disputable and is withholding cooperation under the CPPI Policy's Proactive Resolution Provision on that basis.

85. The JV has satisfied all conditions under the CPPI Policy necessary to invoke the Proactive Resolution Provision and is entitled to assistance with its Protective Claim and indemnity from Berkley for its losses over and above the amount recoverable under its Protective Claim.

86. Berkley has failed to fulfill its duties and obligations under the CPPI Policy and at law.

87. As a result of Berkley's actions, the JV has and will continue to suffer damages.

88. Plaintiff has satisfied all pertinent conditions in the CPPI Policy and hereby pursues the following causes of action:

## COUNT I
## BREACH OF CONTRACT AGAINST DEFENDANT

89. Plaintiff repeats and realleges all allegations contained in paragraphs 1 through 90 as if fully set forth herein.

90. Berkley duly executed and delivered the CPPI Policy to Plaintiff in

consideration for premiums paid.

91. The CPPI Policy is a valid and enforceable written contract of insurance which was in full force and effect at all relevant times referenced herein.

92. The JV is, and at all relevant times was, in compliance with all conditions precedent to coverage under the Policy.

93. Berkley has failed to fulfill its obligation to consult with the JV in the prosecution of the JV's **Protective Claim** against HDR and provide its input on strategy for the efficient resolution of such **Protective Claim**, pursuant to the Proactive Resolution Provision.

94. Berkley has failed to fulfill its obligation to attend or otherwise participate in settlement negotiations, including mediations and settlement conferences, for the resolution of the JV's **Protective Claim**, pursuant to the Proactive Resolution Provision.

95. Berkley has failed to fulfill its obligation to assist the JV in negotiations with representatives for HDR's **Recoverable Insurance**, pursuant to the Proactive Resolution Provision.

96. Berkley has failed to pay the portion of the JV's **Protective Claim** in excess of the available collectible **Recoverable Insurance**, pursuant to the Proactive Resolution Provision, despite the JV's reasonable efforts to recover its **Protective Loss** due to the refusal of HDR to settle the JV's substantiated **Protective Claim**.

97. Despite the JV's satisfaction of all requirements for the coverage sought under the CPPI Policy, Berkley has unreasonably refused and/or otherwise failed to provide the JV with coverage due and owing under the CPPI Policy.

98. Berkley's refusal and/or failure to provide coverage benefits due and owing to the JV under the Policy constitutes a breach of the Policy.

99. As a result of Berkley's breach of the Policy, the JV has suffered damages and will continue to suffer damages in the future.

100. The JV respectfully requests this Court issue an award for an amount equal to the damages that the JV has suffered, and will continue to suffer, as a result of

Berkley's breaches, including attorneys' fees and costs as deemed appropriate by this Court.

## COUNT II
## Declaratory Judgment

101. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 102 above as if fully set forth herein.

102. This is an action pursuant to Chapter 86, Fla. Stat., seeking a declaratory judgment against Defendant.

103. Because the JV has provided sufficient substantiation that Berkley should reasonably be satisfied that the liability of HDR and the value of the JV's Protective Loss are not reasonably disputable and exceed all collectible Recoverable Insurance, Berkley is obligated to fulfill its obligations under the Proactive Resolution Provision of the CPPI Policy, including to pay the portion of the JV's Protective Loss in excess of the available collectible Recoverable Insurance.

104. To date, Berkley has refused to fulfill its obligations under the Proactive Resolution Provision of the CPPI Policy, despite repeated written requests from the JV for it to do so.

105. Therefore, the parties have a real, justiciable controversy between them and have an actual and practical need for this Court to adjudicate their rights as set forth above regarding Defendant's obligations under the Policies to pay Plaintiff's damages arising out of the loss.

106. The JV has a bona fide, actual, present, and practical need for a declaration of its rights under the CPPI Policy.

107. The declaration concerns a present, ascertained, or ascertainable state of facts or a present controversy as to a state of facts.

108. A power, privilege, or right of the JV is dependent upon the facts or the law applicable to the facts.

109. Berkley has expressed an actual, present, adverse, and antagonistic interest in the subject matter, in fact and/or in law.

110. The antagonistic and adverse interests of all parties are before the Court.

111. The issues sought to be adjudicated are not merely theoretical, and the JV is not seeking an advisory opinion of the Court.

112. A determination as to the scope and amount of coverage afforded under the CPPI Policy has not been resolved between the JV and Berkley.

113. A declaratory judgment is necessary and appropriate to determine the rights and duties of the JV and Berkley pursuant to the CPPI Policy.

## PRAYER FOR RELIEF

WHEREFORE, the JV prays for judgment against Defendant as follows:

1. All direct, actual, and consequential damages resulting from Berkley's breaches of the CPPI Policy;
2. Attorneys' fees and costs pursuant to Fla. Stat. § 627.428;
3. Pre-judgment and post-judgment interest as permitted by law;
4. All costs of Court;
5. A declaration of the rights of the parties as follows:
    a. This Court has jurisdiction over the subject matter of this dispute;
    b. This Court has jurisdiction over the parties to this dispute;
    c. The CPPI Policy was in full force and effect at all times relevant to the loss claimed by the JV;
    d. The substantiation provided by the JV that the liability of HDR and the value of the JV's **Protective Loss** are not reasonably disputable was sufficient to trigger Berkley's obligations under the Proactive Resolution Provision;
    e. The JV's efforts to recover its **Protective Loss** were reasonable;
    f. The JV's efforts to recover its **Protective Loss** failed due to the refusal of HDR or the representatives for **Recoverable Insurance** to settle the JV's

substantiated **Protective Claim**; and

g. Berkley is obligated to pay the portion of the JV's **Protective Loss** in excess of HDR's available collectible **Recoverable Insurance**; and

6. Such other relief, at law or in equity, to which the JV is justly entitled and the Court deems just and proper under the circumstances.

**JURY DEMAND**

The JV hereby demands a trial by jury on all issues so triable in this action.

Respectfully submitted on this 6th day of April, 2022.

/s/ Holly A. Rice
Holly A. Rice, Esq.
Florida Bar No. 89138
Saxe Doernberger & Vita, P.C.
851 5th Avenue North, Suite 301
Naples, Florida 34102
Tel: (239) 316-7244
Primary: sgiagnorio@sdvlaw.com
Secondary: jwelch@sdvlaw.com
Secondary: wbennett@sdvlaw.com

*Attorneys for Plaintiff Archer Western – de Moya Joint Venture*